UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MICHAEL JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-01088-JPH-TAB |
| | ) | |
| ARTHUR SIBLEY, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND
DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Christopher Michael Johnson brought this civil rights action pursuant to 42 U.S.C.

§ 1983. He named as defendants Officers Arthur Sibley, Robert Stradling, Robert Muller,

Mark Rand, and Lee Rabensteine. During execution of a search warrant, Mr. Johnson shot at the

officers and was shot at by the officers in return. Mr. Johnson alleges that the search and the search

warrant were invalid and unconstitutional. He further alleges that the IMPD officers' shooting at

him was unconstitutional.

Before the Court are cross-motions for summary judgment filed by Mr. Johnson, dkt. 48,

and the defendants, dkt. 61. For the reasons explained below, Mr. Johnson's motion for summary

judgment, dkt. [48], is **DENIED**, and the defendants' motion for summary judgment, dkt. [61], is

**GRANTED**.

The defendants' motion to strike Mr. Johnson's reply, dkt. [73], is **DENIED** and

Mr. Johnson's motion to not strike his reply brief,[1] dkt. [76], is **GRANTED**. While Mr. Johnson

---

[1] Although Mr. Johnson titles his motion as "Plaintiffs(s) Motion for the Court Not to Strike Plaintiff(s) Response Brief for Summary Judgment," it appears that his brief was intended to respond to Defendant's motion to strike his reply brief.

did not seek leave for the untimely filing, the Court exercises its discretion to permit Mr. Johnson to file a late-filed reply. *United States v. Brown*, 133 F.3d 993, 997 (7th Cir. 1998).

## I.    Summary Judgment Legal Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

The court need only consider the cited materials and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. Fed. R. Civ. P. 56(c)(3); *Grant v. Trs. of Ind. Univ.,* 870 F.3d 562, 573–74 (7th Cir. 2017). The non-moving party bears the burden of specifically identifying the relevant evidence of record. *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d

427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)).   Cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.      Material Facts[2]

The following facts are undisputed for purposes of the motion for summary judgment. To the extent they were not disputed by Mr. Johnson, the Court adopts portions of defendants' statement of undisputed material facts.

### A.      Mr. Johnson's Presence at 2122 Spann Avenue on December 12 and 13, 2017

On December 12, 2017, Mr. Johnson went to a friend's house at 2122 Spann Avenue. Mr. Johnson does not own the property, nor did he live there.  Mr. Johnson states that he paid certain utilities at 2122 Spann Avenue, such as the lights, water, internet, and phone line, but acknowledges he did not pay rent. Dkt. 66 at 3.  According to Mr. Johnson, he was only at 2122 Spann Avenue "to hang out over there."  He was just "visiting" a friend's aunt named Jenny. Mr. Johnson did not have the authority to determine who could or could not visit or reside there.

At some point after Jenny left, Mr. Johnson remained in the home watching television and consuming cocaine.  Later that evening, Jenny's niece, Jasmine Miller, her brother, Hiro, and her brother's girlfriend, Bree, came to the house.  Mr. Johnson was still in the home at that time.  Hiro and Bree slept in the living room and Mr. Johnson and Jasmine slept in the bedroom.  The group spent the night there and remained there through the afternoon of December 13, 2017.

---

[2] The defendants have included substantial citations to admissible evidence in support of their statement of undisputed facts. *See* dkt. 63 at 1-11.  For the sake of conciseness, the Court will exclude citations to the defendants' evidence.

At some point on December 13, 2017, Mr. Johnson's friend, Jesse Hamler, came to 2122 Spann Avenue to discuss the purchase of a dog. Mr. Johnson and Mr. Hamler talked in the kitchen. Jasmine was still in the bedroom and Bree and Hiro were in the living room at the front of the house.

**B.      IMPD Obtains a No Knock Warrant on the Morning of December 13**

In December 2017, an IMPD Narcotics/Vice Unit investigation revealed that a man known as "Baby Boy" was selling narcotics out of a dwelling at 2122 Spann Avenue. The detectives were able to identify "Baby Boy" as Christopher Johnson. At the time of this investigation, Mr. Johnson was on federal probation for dealing and possession of narcotics, and two counts of being a felon in possession of a firearm.

On December 12, 2017, IMPD SWAT Officer Lee Rabensteine was the assistant team leader for a search warrant that was going to be executed the following day at 2122 Spann Avenue. Lieutenant Robert Stradling, Sergeant Mark Rand, and Officers Arthur Sibley, Robert Muller, and William Amberger were also assigned to assist with the execution of the warrant. Officer Rabensteine performed a drive by of the location, where he observed "a good camera system on the house." These cameras appeared to have "visibility on both Spann Avenue and the alley behind the target location." Based on his observations, Officer Rabensteine believed that the team executing the warrant would be "compromised" as soon as they exited the vans at the target location.

The investigation revealed that Mr. Johnson had a lengthy criminal history and was on federal parole for a serious violent felony, guns were present at the residence, the doors to the home were barricaded and there was a large, aggressive dog at the house. The officers had reason to believe that there was surveillance outside of the home. Based on these facts, the Narcotics Unit

requested a no-knock search warrant[3] for 2122 Spann Avenue. The request was granted, and the court issued the no-knock warrant at 9:51:25 a.m. on December 13, 2017.[4]

### C. IMPD's Service of the Warrant at 2122 Spann Avenue

On December 13, 2017, Officer Rabensteine did another drive by of the location to confirm that cameras were still visible and there were no new security doors at the property. The IMPD officers assisting with the execution of the warrant assembled for a briefing on the facts of the investigation, including the basis for the no-knock warrant.

Two teams were assigned to breach the home during the execution of the warrant. One team was assigned to the side of the house marked as "1" in the image of house included at Exhibit A, which was the South-facing door of this double unit. Another team was assigned to the East-facing door, which is the marked as "4" in Exhibit A. Lieutenant Stradling, Sergeant Rand, and Officers Muller, Sibley, Rabensteine, and Amberger were all assigned to the "4"-side team. All of the officers were dressed in full uniform, wearing navy blue pants and a long-sleeve navy blue shirt, with IMPD patches on both shoulders and the word POLICE affixed to the front and back of the upper-body armor. *See* dkt. 62-11 at 6, 8-10.

Officer Rabensteine was assigned to lead the "4"-side team to their breach point on the East-side door. Officer Amberger was assigned to the ram and responsible for forcing the door

---

[3] A no-knock search warrant allows the police to serve a search warrant at the intended location without announcing their presence or waiting outside for any specified period of time before entering. The purpose of no-knock warrants is to enhance the safety of the officers serving the warrant. Law enforcement must establish special circumstances or justifications in order to obtain a no-knock search warrant.

[4] Although not relevant to the claims of this case, a second search warrant was obtained on December 13, 2017, at 3:26 p.m. that was directed towards the seizure of clothes and other property of Mr. Johnson at Eskenazi Hsopital. Dkt. 48-1 at 1-4. The second search warrant, which was obtained by Officer Daniel Kepler, is the sole focus of Mr. Johnson's motion for summary judgment. *See* dkt. 48 at 2-4. However, Officer Kepler is not a defendant in this action. Moreover, Mr. Johnson's claims regarding this second search warrant are proceeding in *Johnson v. Kepler*, No. 1:19-cv-01055-JMS-TAB, and are not relevant in this action about the validity of the search under the first search warrant and the appropriateness of the use of force by the officers.

open.  Lieutenant Stradling was assigned the breaching shotgun, which is used to breach a door. Officer Sibley was assigned to be the first officer through the door once it was breached.  Officer Muller would follow Officer Sibley and Sergeant Rand would follow Officer Muller.  There was also a diversion team assigned to the "1"-side of the house to deploy a noise-flash diversionary device using a bang pole.  These are commonly referred to as "flashbangs."

The officers arrived at 2122 Spann Avenue in two unmarked vans—the first approached the front of the house and the second approached the rear of the house through an alley.  When the "4"-side team parked in the alley, they jumped out of the van and sprinted as fast as they could to the breach point on the "4"-side.  Just as the "4"-side team approached the door, the "1"-side crew was getting ready to put the flashbang in the window.  The bang pole team yelled, "Police! Search warrant!"  Glass broke, and the flashbang was detonated.

Mr. Johnson and Mr. Hamler were talking in the kitchen when they heard what sounded like a "commotion" and glass breaking in the living room area.  According to Mr. Johnson, it sounded "like somebody was entering the home."  Mr. Johnson then saw Hiro and Bree run from the living room towards a bedroom at the rear of the house.  Mr. Hamler also took off running behind Hiro and Bree towards the bedroom.  There was a revolver in front of the microwave that was clearly visible and accessible to anyone in the kitchen.  Mr. Johnson picked up the gun when he heard the commotion and saw Mr. Hamler start running.

After Officer Amberger heard the flashbang detonate, he started to ram the door.  As he did so, Officer Sibley yelled "Police! Search warrant!"  Officers heard the announcements when standing down the street.  The first strike on the door caused the door to come open, but the door only opened about 4-6 inches and then closed again as if "something had pushed the door shut." The officers on the "4"-side were yelling, "Police! Search warrant! Police! Search warrant!"  At

6

that point, Mr. Johnson was standing in the kitchen with his back to the door. Sergeant Rand and Officers Sibley and Muller moved in and were lined up horizontally next to Lieutenant Stradling, directly in front of the door.

Officer Amberger hit the door a second time. "This time, the entire door [came] off the hinges off the frame and kind of pushe[d] in and then turn[ed] sideways. The door rotated around so it was kind of on edge … and then the top of the door leaned up against the walls. The door was kind of angled from the upper left-hand corner to the lower right-hand corner and almost on edge toward [the officers]." Dkt, 62-7 at ¶ 20. See Exhibit B.

When the door opened the second time, it hit Mr. Johnson. Mr. Johnson landed with his back against the wall, his right side facing the officers, and the door leaning at an angle on top of him. By that time, Lieutenant Stradling, Sergeant Rand, and Officers Sibley and Muller were probably about five to six feet away from the door.

As soon as Officer Sibley saw Mr. Johnson, he yelled, "Show me your hands!'" Dkt. 62-3 at ¶ 21. "[Mr. Johnson] came up with his face and he brought up a silver revolver." *Id.* Mr. Johnson's right hand was sticking out of the door with the revolver in his hand. Dkt. 62-7 at ¶ 23. Johnson intentionally began firing his weapon. Mr. Johnson testified: "I grabbed [the gun] and I fired it and I fired another time, and then I shot a couple times in front of me, reached my arm around the door and fired a couple times." Dkt 62-1 at 60, lns. 16-19. Officers Sibley, Rabensteine, and Muller all saw distinct muzzle flashes coming from Mr. Johnson's direction. When the officers realized that Mr. Johnson was discharging his weapon, they believed that he posed an imminent and deadly threat and began to return fire. Officer Sibley fired one round from his rifle. As he did so, he felt a round strike his left forearm. Officer Sibley sustained multiple gunshot wounds in his left arm from Mr. Johnson's weapon.

Mr. Johnson turned to move away from the door and began crawling towards the hallway with the weapon in his hand. Lieutenant Stradling ordered him: "Drop the gun!" but Mr. Johnson did not comply and kept crawling. Since Mr. Johnson posed a deadly-force threat while he held the gun that he had fired at the officers, Lieutenant Stradling fired one more round in his direction. Mr. Johnson did not drop the gun until he reached the opposite side of the kitchen. At that time, the officers stopped shooting and backed away from the door because Mr. Johnson no longer posed an immediate threat to the officers.

### D.    Mr. Johnson Surrenders

As the officers were returning to their van, two of the officers observed someone trying to exit the rear window of the house. At that time, Officer Sibley was being treated by a medic for his wounds. While Sergeant Rand and Lieutenant Stradling were communicating with officers from the "1"-side team over the radio, Mr. Johnson surrendered and exited the front of the house. Mr. Johnson was provided immediate medical assistance in the front yard. He was eventually taken to the hospital. Mr. Johnson was charged with five counts of attempted murder for shooting at the SWAT officers that afternoon. As a result of the incident, Mr. Johnson states that he undergoes physical therapy and needs daily medication. Mr. Johnson further states that his orthopedist has stated he will be in pain for the rest of his life from the bullet wounds he suffered.

### III.    Discussion

Two of Mr. Johnson's claims are still at issue: (1) defendants conducted a warrantless search 2122 Spann Avenue; and (2) defendants used excessive force when they shot at him. Both claims are against all of the defendants in their individual and official capacities. Each claim is discussed in further detail below.

**A.      Invalid Search Warrant**

        1.      Unconstitutional Search Legal Standard

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. Claims alleging violations of the Fourth Amendment in the context of a search warrant can raise "two separate constitutional issues, one concerning the validity of the warrant and the other concerning the reasonableness of the manner in which it was executed." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987); *see also Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009) ("In evaluating an alleged violation of the Warrant Clause of the Fourth Amendment, we look at two distinct aspects of the warrant -- its issuance and its execution"). When assessing whether a constitutional violation has occurred, "the Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances." *Molina v. Cooper*, 325 F.3d 963, 973 (7th Cir. 2003); *see Graham v. Connor*, 490 U.S. 386, 399 (1989).

"The Fourth Amendment requires that a warrant be supported by probable cause and that it describe, with particularity, the place to be searched and the items or persons to be seized." *Guzman*, 565 F.3d at 396. "[A] search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984). However, "any plain error regarding the warrant's particularity must be clear or obvious, as well as prejudicial, for it to be cognizable." *United States v. White*, 416 F.3d 634, 638 (7th Cir. 2005).

        2.      Issuance of the Search Warrant

There are two search warrants relevant in this action. The first search warrant was requested at 9:24 a.m. on December 13, 2017, for a no-knock warrant of 2122 Spann Avenue,

Indianapolis, Indiana. Dkt. 62-9. The no-knock warrant was issued at 9:51 a.m. on December 13, 2017. *Id.* at 16. IMPD officers arrived at 2122 Spann Avenue later that afternoon around 1:38 p.m. The second search warrant was requested at 3:11 p.m. on December 13, 2017, for a warrant to obtain property and other objects and things from Mr. Johnson while he was at Eskenazi Hospital. Dkt. 48-1 at 1-4. This second search warrant was issued at 3:26 p.m. on December 13. 2017. *Id.* at 3.

In his motion for summary judgment, Mr. Johnson asserts that the IMPD Officer Kepler violated his constitutional rights because the second search warrant was improperly obtained and therefore invalid. Mr. Johnson's claims regarding this second search warrant are proceeding in *Johnson v. Kepler*, No. 1:19-cv-01055-JMS-TAB, and the validity of the second search warrant is not a relevant issue in this action.

The defendants argue that the no-knock search warrant they obtained was valid, that the search pursuant to that warrant was authorized, and that Mr. Johnson lacks standing to challenge the search warrant because he had no constitutionally protected reasonable expectation of privacy at 2122 Spann Avenue as it was not his home. *See* dkt. 63 at 15-17.

In his response to the defendants' motion for summary judgment, Mr. Johnson only challenges the no-knock warrant's validity to the extent that it is not labeled with the words "The State of Indiana" in upper-lower case lettering, as allegedly required by Indiana Constitution Article 7, § 18[5], and instead lists "County of Marion" and "State of Indiana" in all capital letters. This is not a valid challenge to the validity of a search warrant nor does the Indiana Constitution require that "State of Indiana" be in upper-lower case lettering versus capital letters. Even if such

---

[5] Indiana Constitution Article 7, § 18 provides: "Criminal Prosecutions. All criminal prosecutions shall be carried on in the name, and by the authority of the state; and the style of all process shall be: 'The State of Indiana.'"

a requirement existed and was not followed, "[m]ere technical errors in particularity are not enough to invalidate a search warrant." *United States v. Johnson*, 26 F.3d 669, 694 (7th Cir. 1994) (concluding that an omission from the warrant was "not fatal [because] there was no risk that . . . officers executing the warrant would search some other house.").

There is no designated evidence showing a warrantless search or that the first search warrant was improperly issued or executed and no evidence that the defendants violated any of Mr. Johnson's Fourth Amendment rights when they obtained and served the no-knock search warrant. Accordingly, the defendants are entitled to summary judgment in their favor on the claims related to the no-knock search warrant.

**B.      Excessive Force**

1.      <u>Excessive Force Legal Standard</u>

A claim that an officer used excessive force in seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham*, 490 U.S. at 388. "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Id*. at 396 (citations and internal quotation marks omitted). Factors relevant to the inquiry include: "'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Baird v. Renbarger,* 576 F.3d 340, 344 (7th Cir. 2009) (alterations in original) (quoting *Graham*, 490 U.S. at 396). "When addressing the use of deadly force, the court considers whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others. If the suspect threatens the officer with a weapon, deadly force may be used. At that point, the risk of serious physical harm to the officer or others has been shown." *Sanzone v. Gray*, 884 F.3d 736,

740 (7th Cir. 2018) (citations omitted), *reh'g denied* (Mar. 29, 2018). And when an officer's use of deadly force is challenged as being excessive, the officer is entitled to assert qualified immunity as a defense "unless existing precedent squarely governs the specific facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal quotation omitted). This is so because "[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case[.]" *Id.*

An officer's use of force is "judg[ed] from the totality of the circumstances at the time of the [seizure]." *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir. 2013) (alterations in original) (citation and internal quotation marks omitted). "'[W]hen material facts (or enough of them to justify the conduct objectively) are undisputed, then there would be nothing for a jury to do except second-guess the officers,'" therefore, "[i]n this situation...the reasonableness of the force used is a legal question." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (emphasis in original) (quoting *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)). The measure of reasonableness is made "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and pays "careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. Only the facts known to the officer at the time of the incident are relevant to the reasonableness determination. *Fitzgerald v. Santoro*, 707 F.3d 725, 732-733 (7th Cir. 2013). Reasonableness is not based on hindsight, but rather is determined considering the perspective of the officer on the scene, allowing "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *DeLuna v. City of Rockford*, 447 F.3d 1008, 1010 (7th Cir. 2006).

### 2. Use of Deadly Force by IMPD Officers against Mr. Johnson

In this case, when the defendants first arrived at 2122 Spann Avenue, they yelled out "Police! Search Warrant!" as they entered the home. When the door was rammed open, Mr. Johnson landed with his back against the wall and the door leaning at an angle on top of him. His response was to immediately shoot in the direction of the officers. Officer Sibley was shot multiple times in his left arm from Mr. Johnson's weapons. Because Mr. Johnson was shooting at the officers, the officers returned fire. Mr. Johnson turned to move away from the door and began crawling towards the hallway with the weapon in his hand. Lieutenant Stradling ordered him to drop the gun, but Mr. Johnson refused and kept crawling with a gun. Because Mr. Johnson still posed a threat Lieutenant Stradling fired one more round in his direction. Mr. Johnson did not drop the gun until he reached the opposite side of the kitchen. At that time, the officers stopped shooting. Mr. Johnson does not dispute that he fired first and that he fired multiple times. Because these facts are undisputed, the "reasonableness of the force used is a legal question." *Cyrus*, 624 F.3d at 862.

Under these circumstances where Mr. Johnson fired first and fired multiple rounds at the police officers, a reasonable officer would have strong probable cause to believe that Mr. Johnson posed an immediate threat to the safety of the officers, and therefore, under *Sanzone*, deadly force in response was appropriate. *Sanzone*, 884 F.3d at 740. Although Mr. Johnson argues that he should not have been shot at when his back was turned, *see*, *e.g.*, dkt. 70, Mr. Johnson had already shot a police officer, was still holding a gun and was actively resisting arrest or attempt to evade arrest by fleeing. These all support Lieutenant Stradling's use of force under the reasonableness three-factor *Baird* test. *Baird,* 576 F.3d at 344 ("'[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is

13

actively resisting arrest or attempting to evade arrest by flight.'"). No reasonable jury could find

that the officers' use of force was unreasonable so the defendants are entitled to summary judgment

in their favor on the use of force claims.[6]

### C. Official Capacity Claims

Mr. Johnson brought his claims against the defendants in both their individual and official

capacities. State officials who are named as defendants in their "official capacities" are not

considered "persons" under 42 U.S.C. § 1983 in an action for money damages. *Hafer v. Melo*,

502 U.S. 21, 26 (1991). This is because "a suit against a state official in his or her official capacity

is not a suit against the official but rather is a suit against the official's office … [and] is no different

from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66-67 (1989).

Thus, Mr. Johnson's claims against the defendants in their official capacities are actually claims

against the City of Indianapolis. Claims against the City are evaluated under the mandates of

*Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).

In *Monell*, the Court "conclud[ed] that a municipality cannot be held liable solely because

it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on

a *respondeat superior* theory. *Id.* at 691. In other words, "a local government may not be sued

under § 1983 for an injury inflicted solely by its employees or agents." *Id.* at 694. Rather, in order

to establish governmental liability, Mr. Johnson bears the burden of producing evidence sufficient

to show: "(1) an express policy that, when enforced, causes a constitutional deprivation;

(2) a widespread practice that, although not authorized by written law or express municipal policy,

is so permanent and well settled as to constitute a 'custom or usage' with the force of law; or (3) an

allegation that the constitutional injury was caused by a person with 'final policymaking

---

[6] Because the court grants summary judgment on the basis there was no constitutional violation, it does not
reach the qualified immunity defense.

authority.'" *Estate of Crouch v. Madison Cty.*, 682 F. Supp. 2d 862, 877 (S.D. Ind. 2010) (quoting *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006))).

As explained above, Mr. Johnson has failed to show any constitutional deprivation in the officers' actions in executing a valid search warrant and in firing at Mr. Johnson in response to being fired at. Nor has Mr. Johnson identified any express policy, widespread practice, or individual with "final policymaking authority." Accordingly, summary judgment on the official capacity claims is warranted.

### IV. Conclusion

Mr. Johnson has not identified a genuine issue of material fact as to his claims in this case and the defendants are entitled to judgment as a matter of law. Therefore, the defendants' motion for summary judgment, dkt. [61], is **GRANTED**. Mr. Johnson's motion for summary judgment, dkt. [48], is **DENIED**.

Judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 9/20/2019

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

CHRISTOPHER MICHAEL JOHNSON
270993
Plainfield Correctional Facility
Inmate Mail/Parcels
727 Moon Road
Plainfield, IN 46168

Traci Marie Cosby
OFFICE OF CORPORATION COUNSEL
Traci.Cosby@indy.gov

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov

EXHIBIT A





